## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**J. JEREMIAH MAHONEY,**

     **Plaintiff,**

      **v.**

**SHAUN DONOVAN, Secretary of U.S.
Department of Housing and Urban
Development, et al.,**

     **Defendants.**

Civil Action No.  10-1703 (JEB)

## <u>MEMORANDUM OPINION</u>

Plaintiff J. Jeremiah Mahoney is an Administrative Law Judge in the U.S. Department of

Housing and Urban Development.  In this lawsuit he asserts two types of claims against

Defendants HUD, his supervisor David Anderson, and the Office of Personnel Management.  He

first avers that HUD and Anderson unlawfully retaliated against him through both discrete

actions and the creation of a hostile work environment after he had participated in an Equal

Employment Opportunity investigation of a complaint filed by a fellow ALJ.  His second set of

claims is more novel.  In these, he alleges that all Defendants violated the Administrative

Procedure Act by infringing on or failing to protect his judicial independence.

Defendants have now filed a Motion to Dismiss and an Alternative Motion for Partial

Summary Judgment.  Although Plaintiff's causes of action are varied, they all meet with the

same fate.  More specifically, because some of his retaliation claims were not exhausted, others

do not amount to materially adverse employment actions, and the incidents alleged do not, as a

matter of law, constitute a hostile work environment, Plaintiff's counts for retaliation must fail.

As he lacks standing to sue for the alleged APA violations, those, too, will be dismissed.

I.     **Background**

A.   Retaliation Claims

Both Plaintiff and Alexander Fernández have been employed as HUD ALJs since

September 21, 2008.  Compl., ¶ 29.  On November 4 of that year, Judge Fernández filed an

informal complaint of discrimination with HUD's EEO Office relating to Defendant Anderson's

alleged failure to accommodate his medical conditions.  Id., ¶¶ 30-32.  Anderson is the Director

of HUD's Office of Hearings and Appeals (OHA) and the first-level supervisor of both Plaintiff

and Judge Fernández.  Id., ¶¶ 10-12. Plaintiff was a witness to some of the incidents at issue in

Judge Fernández's complaint, and he believed Judge Fernández was being unlawfully

discriminated and retaliated against.  See id., ¶¶ 33-35.  Plaintiff informed supervisors about, and

provided statements to the EEO officers investigating, Judge Fernández's complaint.  See id., ¶¶

36-37.  Judge Fernández has since proceeded with his discrimination and retaliation claims in

district court; that case is currently pending before Judge Richard J. Leon here in Washington.

See id., ¶ 34; Fernandez v. Donovan et al., Civ. Act. No. 10-185 (D.D.C. filed Feb. 2, 2010).

Plaintiff alleges that Defendants HUD and Anderson retaliated against him for

participating in the EEO investigation of Judge Fernández's complaint when they took several

steps that are independently actionable and that, considered cumulatively, created a hostile work

environment.  Plaintiff has identified five incidents of alleged retaliation, two of which occurred

in Spring 2009.  See Opp. at 19-29.  First, the Docket Clerk was moved to a building four blocks

from the building in which the ALJs worked.  See Compl., ¶ 40.  Plaintiff "pointed out the

impracticality of this arrangement considering the hands-on nature of Docket Clerk duties," but

Anderson declined to reconsider or appoint an Acting Docket Clerk.  See id., ¶¶ 41-43.  Second,

when Plaintiff asked Anderson whether he could apply for a telework agreement, "Anderson said

Judge Mahoney could apply but a telework agreement would not be approved."  Id., ¶¶ 53-54.

The other three incidents took place in December 2009.  First, on December 15,

Anderson hosted "an office holiday party" during business hours at a private club to which only

"selected employees" were invited.  Id., ¶¶ 56-57.  Plaintiff was neither informed of nor invited

to the party.  Id., ¶ 57.  Second, on December 18, Anderson told Plaintiff not to speak with

HUD's Office of Ethics after he had inquired about the propriety of two law clerks' working for

both OHA and HUD's Office of Public and Indian Housing (PIH).  See id., ¶¶ 49-51.  Third, on

December 31, Anderson responded by email to an earlier email from Plaintiff regarding the

incident with the Docket Clerk.  Id., ¶¶ 44-47.  Anderson's email stated, in part:

> [F]uture challenges to my decision not to appoint an Acting Docket
> Clerk may be viewed as insubordinate conduct, as improper
> interference with my management responsibilities as OHA
> Director, and/or as interference with the exercise of my discretion
> as supervisor, and may result in the consideration of appropriate
> disciplinary action against you.

Id., ¶ 47.

B.   APA Claims

Plaintiff's APA claims relate to a different set of incidents and HUD practices that he

alleges interfered with the decisional independence guaranteed to ALJs by the APA.  First, he

contends that Anderson "failed to consistently assign cases to him in a rotating manner" and

instead "selectively assigned cases to judges based upon political considerations and/or the

Secretary's perceived interests."  Id., ¶ 61.  Second, Plaintiff asserts that Anderson engaged in *ex

parte* communications with parties in cases pending before Plaintiff without his knowledge or

consent.  See id., ¶¶ 62-65.  Third, despite his and Judge Fernández's objections, Plaintiff

maintains that Anderson established a practice of releasing Notices of Election in Fair Housing Act cases to the Department of Justice before they were officially released by the ALJs, thereby providing DOJ with advance notice of cases that were soon to be filed in district court. See id., ¶¶66-73. Fourth, he alleges that Anderson prevented the Docket Clerk from providing Plaintiff with "docket numbers for the more than 100 Mortgagee Review Board . . . cases that had recently been directed to the [Office of Administrative Law Judges (OALJ)]." Id., ¶¶ 74-76. Fifth and finally, he claims that HUD failed to supply its ALJs with legal-research resources for more than one month during Summer 2009. See id., ¶¶ 83-85.

On July 1, 2009, Plaintiff wrote a letter to John Berry, the Director of OPM, asking that he "exert OPM's enforcement authority to investigate and correct pervasive interference with judicial independence sanctioned by HUD senior leadership." Id., ¶¶ 86-87. Jeffrey Sumberg, an OPM official, responded a few months later. Id., ¶ 88. When Plaintiff and Judge Fernández met in person with Sumberg on January 13, 2010, he "expressed surprise and concern" and indicated he would discuss the issues raised by the ALJs with OPM leadership. See id., ¶¶ 89-92. On April 28, 2010, Sumberg informed Plaintiff and Judge Fernández that, "based upon advice of the OPM General Counsel, OPM would do nothing because of Judge Fernández's pending litigation." Id., ¶ 94.

C. Procedural History

Plaintiff made a request for EEO counseling and filed an informal complaint of discrimination with HUD's EEO Office on January 12, 2010. Id., ¶ 18. He then filed a formal charge of discrimination on March 11. Id., ¶ 19. On June 15, Plaintiff was notified that his complaint had been dismissed for failure to state a claim, and he received the Notice of Dismissal in July. Id., ¶¶ 23-24. He filed the Complaint initiating the instant lawsuit on October

5.  Defendants have now filed a Motion to Dismiss for lack of subject-matter jurisdiction under

Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6),

along with an Alternative Motion for Partial Summary Judgment on the exhaustion issue only.

## II.    Legal Standard

### A.    <u>Motion to Dismiss</u>

In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's

factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be

derived from the facts alleged.'" <u>Sparrow v. United Air Lines, Inc.</u>, 216 F.3d 1111, 1113 (D.C.

Cir. 2000) (quoting <u>Schuler v. United States</u>, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal

citation omitted); <u>see also</u> <u>Jerome Stevens Pharms., Inc. v. FDA</u>, 402 F.3d 1249, 1253 (D.C. Cir.

2005). This standard governs the Court's considerations of Defendants' Motion under both Rules

12(b)(1) and 12(b)(6).  <u>See</u> <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974) ("in passing on a

motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for

failure to state a cause of action, the allegations of the complaint should be construed favorably

to the pleader"); <u>Walker v. Jones</u>, 733 F.2d 923, 925-26 (D.C. Cir. 1984) (same).  The Court

need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an

inference unsupported by the facts set forth in the Complaint.  <u>Trudeau v. Fed. Trade Comm'n</u>,

456 F.3d 178, 193 (D.C. Cir. 2006) (quoting <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)

(internal quotation marks omitted).

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a

complaint fails to "state a claim upon which relief can be granted." Although the notice pleading

rules are "not meant to impose a great burden on a plaintiff," <u>Dura Pharm., Inc. v. Broudo</u>, 544

U.S. 336, 347 (2005), and "detailed factual allegations" are not necessary to withstand a Rule

12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (internal quotation omitted).  Plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  Though a plaintiff may survive a 12(b)(6) motion even if "recovery is very remote and unlikely," Twombly, 550 U.S. at 555 (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)), the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Id. at 555.

To survive a motion to dismiss under Rule 12(b)(1), Plaintiff bears the burden of proving that the Court has subject matter jurisdiction to hear his claims.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Id. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987) (alteration in original)). Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens, 402 F.3d at 1253; see also Venetian Casino Resort, L.L.C. v. E.E.O.C., 409 F.3d 359, 366 (D.C. Cir. 2005) ("given the present posture of this case – a dismissal under Rule 12(b)(1) on ripeness grounds – the court may consider materials outside the pleadings"); Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

B.      <u>Motion for Summary Judgment</u>

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986); <u>Holcomb v. Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. <u>Holcomb</u>, 433 F.3d at 895; <u>Liberty Lobby, Inc.</u>, 477 U.S. at 248. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>Liberty Lobby, Inc.</u>, 477 U.S. at 248; <u>Holcomb</u>, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).

The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." <u>Taxpayers Watchdog, Inc., v. Stanley</u>, 819 F.2d 294, 297 (D.C. Cir. 1987). When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Liberty Lobby, Inc.</u>, 477 U.S. at 255; <u>see also</u> <u>Mastro v. PEPCO</u>, 447 F.3d 843, 850 (D.C. Cir. 2006); <u>Aka v. Washington Hospital Center</u>, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (<em>en banc</em>). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." <u>Czekalski v. Peters</u>, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).  The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor.  <u>Laningham v. United States Navy</u>, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  <u>Liberty Lobby, Inc.</u>, 477 U.S. at 249-50.

## III.    Analysis

Plaintiff's Complaint contains five counts.  Count I charges Defendants HUD and Anderson with retaliation in violation of the Rehabilitation Act, the Americans with Disabilities Act, and Title VII of the Civil Rights Act of 1964.  Compl., ¶¶ 102-03.  Count II is a hostile-work-environment retaliation claim against the same Defendants pursuant to the same set of statutes.  <u>See id.</u>, ¶¶ 104-05.  Counts III and IV assert that HUD and Anderson violated the APA by failing to assign cases to ALJs by rotation and by taking various other actions that interfered with Plaintiff's judicial independence.  <u>See id.</u>, ¶¶ 106-10.  Count V charges Defendant OPM with "failing to carry out its duty to ensure ALJ independence" in violation of the APA.  <u>Id.</u>, ¶¶ 111-12.  The Court will first address the discrete retaliation claims, then turn to the hostile-work-environment claim, and finally consider the judicial independence-based APA claims.

### A.  <u>Discrete Retaliation Claims (Count I)</u>

Plaintiff contends in his Complaint that actions taken by Defendants HUD and Anderson[1] constitute unlawful retaliation under the Rehabilitation Act, the ADA, and Title VII.  <u>See id.</u>, ¶¶ 102-03.  He has since conceded, however, as indeed he must, that the ADA does not provide an independent statutory basis for his claims.  <u>See</u> Opp. at 1-2 & n.1; <u>Jordan v. Evans</u>, 404 F. Supp. 2d 28, 30 (D.D.C. 2005) ("[A] federal employee has no remedy for employment discrimination

---

[1] Defendants argue that Anderson, whom Plaintiff has sued in his "professional" (<i>i.e.</i>, official) capacity, is not a proper defendant.  <u>See</u> Mot. at 6-7.  Because it will ultimately dismiss all claims against all Defendants, the Court need not reach the question whether Anderson is properly named.

under the APA." (emphasis in original)).  Rehabilitation Act and Title VII claims, accordingly, are all that remain.

"The D.C. Circuit has held that the framework for analyzing anti-retaliation suits under the Rehabilitation Act mirrors that applied for retaliation suits under Title VII of the Civil Rights Act."  Hovsepyan v. Blaya, 770 F. Supp. 2d 259, 269 (D.D.C. 2011) (citing Smith v. District of Columbia, 430 F.3d 450, 455 (D.C. Cir. 2005)).  To make a retaliation claim under either statute, "an employee must show 'she engaged in protected activity, as a consequence of which her employer took a materially adverse action against her.'"  Taylor v. Solis, 571 F.3d 1313, 1320 (D.C. Cir. 2009) (quoting Weber v. Battista, 494 F.3d 179, 184 (D.C. Cir. 2007)).  There is no dispute that speaking up on behalf of ALJ Fernández was protected activity; the issue is joined on the question of materially adverse actions.  Plaintiff has identified five incidents he maintains qualify as such actions.  See Opp. at 21-29. Defendants contend, however, that he failed to exhaust administrative remedies with regard to two of these incidents and that the other three do not constitute materially adverse actions as a matter of law.  The Court agrees with both points and, accordingly, will dismiss Count I.

  1. *Exhaustion*

Federal employees may file a Title VII or Rehabilitation Act action in federal court only after exhausting their administrative remedies before the relevant federal agency for each allegedly discriminatory act.  See Payne v. Salazar, 619 F.3d 56, 65 (D.C. Cir. 2010) (Title VII); Spinelli v. Goss, 446 F.3d 159, 162 (D.C. Cir. 2006) (Rehabilitation Act).  A failure to exhaust administrative remedies for Rehabilitation Act claims is a jurisdictional defect, requiring dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1).  See Spinelli, 446 F.3d at 162.  Because exhaustion of Rehabilitation Act claims "is a jurisdictional requirement,"

"Plaintiff has the burden to plead and prove." Carty v. Dist. of Columbia, 699 F. Supp. 2d 1, 2 n.2 (D.D.C. 2010) (citation omitted), aff'd on other grounds, 2010 WL 4340405 (D.C. Cir. 2010).

"Title VII's exhaustion requirements," on the other hand, "are not jurisdictional." Artis v. Bernanke, 630 F.3d 1031, 1034 n.4 (D.C. Cir. 2011) (citing Menominee Indian Tribe of Wis. v. United States, 614 F.3d 519, 527 (D.C. Cir. 2010)).  Accordingly, a "12(b)(6) motion to dismiss for 'failure to state a claim upon which relief can be granted' is the appropriate vehicle to challenge an alleged failure to exhaust" administrative remedies under Title VII. Rosier v. Holder, 2011 WL 2516152, at *2 (D.D.C. 2011) (citing Artis, 630 F.3d at 1034 n.4). "Because untimely exhaustion of [Title VII] administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving it." Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997) (citation omitted).  In other words, odd as it may seem, Defendants carry the burden of proof under Title VII while Plaintiff bears that burden under the Rehabilitation Act.

"District courts may refer to materials outside the pleadings in resolving a 12(b)(6) motion. But when they do, they must also convert the motion to dismiss into one for summary judgment." Kim v. United States, 632 F.3d 713, 719 (D.C. Cir. 2011) (citing Fed. R. Civ. P. 12(d)).  Where the Court so converts, however, the parties must be provided with the opportunity to present evidence in support of their positions. See Fed. R. Civ. P. 12(d), 56; Kim, 632 F.3d at 719. Defendants have moved in the alternative for partial summary judgment on the exhaustion claims, submitting two declarations in support of their position.  Plaintiff has opposed that Motion on the merits, and he does not contend that converting Defendants' Motion to Dismiss to a Motion for Summary Judgment on the exhaustion question is improper; in fact, he has

presented additional evidence to support his argument.  The additional evidence presented by the

parties, moreover, is integral to their arguments.  The Court, therefore, will consider the

exhaustion question under the summary judgment standard. [2]

Title 29 of the Code of Federal Regulations describes the administrative process for filing

discrimination complaints against the federal government. First, one who believes he has been

subjected to discrimination by his federal-government employer "must consult a Counselor prior

to filing a complaint in order to try to informally resolve the matter."  29 C.F.R. § 1614.105(a).

"An aggrieved person must initiate contact with a Counselor within 45 days of the date of the

matter alleged to be discriminatory . . . ."  Id. § 1614.105(a)(1).  Defendants contend that

Plaintiff failed to exhaust administrative remedies on the two allegedly retaliatory incidents that

took place in Spring 2009 — the transfer of the Docket Clerk and the denial of a telework

agreement — because he did not initiate contact with an EEO Counselor within 45 days of the

incidents.

Per Plaintiff's own pleadings, he contacted an EEO Counselor on January 12, 2010.

Compl. ¶ 18.  It would seem, then, that these two claims are clearly time-barred.  Plaintiff

disagrees, raising two primary arguments in his favor: first, that his prior contacts with

supervisors satisfy the "within 45 days" requirement, and second, that he was not on notice of the

alleged retaliation until he received the December 31, 2009, email, so the 45-day clock did not

begin to run until then.  See Opp. at 15-19.

Although he does not seem to press the argument in his summary judgment briefing,

Plaintiff contends that his contacts with HUD supervisors satisfied the "within 45 days"

---

[2] Perhaps seeing Defendants' Motion for Summary Judgment as an opportunity to file the Surreply to Defendants' Motion to Dismiss that the Court had previously denied him leave to file, Plaintiff's Opposition to Defendants' Partial Summary Judgment Motion addresses far more than just the exhaustion issue.  The Court, however, consistent with its prior ruling, has considered the summary judgment briefing only with respect to the exhaustion claims.

requirement.  He points out our Circuit's acknowledgement that the EEOC itself "has

consistently held that a complainant satisfies the criterion of EEO counselor contact by

contacting an agency official logically connected with the EEO process, even if that official is

not an EEO counselor, and by exhibiting an intent to begin the EEO process."  Miller v.

Hersman, 594 F.3d 8, 11 n.1 (D.C. Cir. 2010) (citing Osuagwu v. Peake, No. 0120081307, 2008

WL 2264405, at *1 (E.E.O.C. May 20, 2008)).  While Plaintiff need not contact an individual

who officially holds the title of "EEO Counselor," he still must contact an official "logically

connected with the EEO process."  Id.  Courts in this district have repeatedly dismissed

discrimination claims in which the plaintiffs failed to express interest in the EEO process and

only raised their complaint with supervisors or HR personnel who were unaffiliated with the

agencies' EEO Offices.  See, e.g., Lane v. Tschetter, 2007 WL 2007493, at *3-4 (D.D.C. 2007);

Carter v. Greenspan, 304 F. Supp. 2d 13, 13-24 (D.D.C. 2004).  This is not a case in which a

plaintiff contacted an individual who held herself out as the proper point of contact.  HUD's

internal regulations and flyers posted in the office, moreover, expressly designated the "full time

EEO counselor" as the appropriate individual to contact.  See 24 C.F.R. § 7.25; Mot., Exh. 2

(Decl. of Jerry Holloway), ¶¶ 9-10.

The person whom Plaintiff contacted, moreover, has confirmed that Plaintiff did not raise

the telecommuting issue at all, that he complained only that Anderson's actions were not an

efficient use of resources and interfered with his judicial independence (not that they were

retaliatory), and that he did not express an intent to pursue the EEO process.  See Mot., Exh. 3

(Decl. of Laurel Blatchford), ¶¶ 9-12.  Plaintiff himself concedes that he did not identify the

incidents in questions as retaliatory in his communications with HUD officials.  See SJ Opp. at 3.

Simply complaining to a supervisor without giving any indication that he viewed the incidents as

retaliatory or wished to pursue his administrative remedies with the EEO Office does not suffice. See Lane, 2007 WL 2007493, at *3-4. Such a contact does not serve to put an agency on notice of an employee's desire to initiate the EEO process.

Plaintiff's second argument is that the 45-day period should be equitably tolled because he "did not realize that Anderson's actions taken against him were retaliatory until [he] received out of the blue an email sent by Anderson at 6:30 p.m. on New Year's Eve, December 31, 2009, that alerted [him] to the fact that Anderson had taken various unexplained and arbitrary actions against him for retaliatory reasons." Opp at 18-19. Plaintiff has testified that he lacked actual notice of Anderson's retaliatory motives until he received that email. See SJ Opp., Exh. 1 (Pl.'s Decl.), ¶¶ 7,8.

Plaintiff is correct that the 45 days "will be tolled if he 'did not know and reasonably should not have known that the [retaliatory] matter or personnel action occurred.'" Stewart v. Ashcroft, 352 F.3d 422, 425 (D.C. Cir. 2003) (quoting 29 C.F.R. § 1614.105(a)(2)). The time may in some circumstances be tolled, moreover, even when a plaintiff was aware of the adverse action in question but not yet aware of the discriminatory motive behind it. See Miller, 594 F.3d at 12. However, "the plaintiff has a responsibility, when possible, to further investigate a personnel action in order to determine whether the action was discriminatory." Id. No facts were kept secret from Plaintiff in this case. He had contemporaneous knowledge of the two incidents in question; he also knew he had engaged in protected activity. This suffices to give rise to a reasonable suspicion of retaliation or trigger the duty to investigate. Indeed, Plaintiff's EEO Complaint states that he had "complained often" about the allegedly retaliatory incidents from as early as Spring 2009. See Mot., Exh. 1 (EEO Complaint). Plaintiff wrote the Director of OPM in July, Compl. ¶ 86, and wrote an email accusing Anderson of "illegal" activities that

created a hostile work environment.  See Blatchford Decl., ¶ 9.  Plaintiff's self-serving

declaration cannot defeat the undisputed evidence showing that he clearly considered the Docket

Clerk and telecommuting incidents to be unlawful well before December 2009.

Because Defendants have demonstrated that Plaintiff failed to exhaust his retaliation

claims based on the two Spring 2009 incidents, therefore, the Court will grant Defendants'

Motion for Summary Judgment with respect to those claims.

2.    <em>Materially Adverse Employment Actions</em>

Although Plaintiff exhausted his administrative remedies with regard to the remaining

three allegedly retaliatory incidents, none of them constitutes a materially adverse employment

action.  "[A] 'materially adverse' action for purposes of a retaliation claim is one that 'could well

dissuade a reasonable worker from making or supporting a charge of discrimination.'"  Gaujacq

v. EDF, Inc., 601 F.3d 565, 577 (D.C. Cir. 2010) (quoting Burlington Northern & Santa Fe Ry.

Co. v. White, 548 U.S. 53, 57 (2006)); see also Mogenhan v. Napolitano, 613 F.3d 1162, 1166

(noting that D.C. Circuit has "applied the Burlington Northern standard to retaliation claims

under the Rehabilitation Act as well as Title VII").  Because, even giving Plaintiff the benefit of

all potential inferences, no reasonable jury could find that not being invited to an office holiday

party, being told not to consult the Ethics Office regarding a particular issue, or being sent an

email suggesting that "disciplinary action" might follow would dissuade a reasonable employee

from supporting a charge of discrimination, the Court will dismiss these claims under Rule

12(b)(6).

a.    Holiday Party

Plaintiff undermines the gravity of his suit by devoting three full pages of his Opposition

to his argument that Defendants retaliated against him in violation of Title VII and the

14

Rehabilitation Act when Anderson failed to invite him to an office holiday party.  He cites <u>Passer</u> <u>v. American Chemical Society</u>, 935 F.2d 322, 332 (D.C. Cir. 1991), for the proposition that "exclusion from a party may rise to the level of a materially adverse action."  Opp. at 25. Plaintiff accurately describes that case as holding that the "cancellation of [a] major public symposium in [an] employee's honor could be an act of retaliation."  <u>Id.</u>  But not being invited to a holiday party that took place off premises is a different kettle of fish from the cancellation of a "major public symposium" intended specifically to honor the plaintiff employee.  Plaintiff's protestations that had he been invited to this party he would have received two or more hours of paid leave are remarkable only for their triviality and in no way bring the slight of not being invited to a two-hour office party into the realm of a materially adverse action.  Rather, the holiday-party incident is precisely the kind of "petty slight[] or minor annoyance[]" that cannot form the basis of a retaliation claim.  <u>Burlington Northern</u>, 548 U.S. at 68.  Title VII and the Rehabilitation Act have simply not put federal courts in the business of policing holiday-party guest lists.

### b.    Instruction not to Consult Ethics Officer

Other than merely restating the <u>Burlington Northern</u> "materially adverse action" standard, Plaintiff provides no support for his argument that Anderson's instructing him not to consult with HUD's Ethics Office constituted a materially adverse action.  <u>See</u> Opp. at 28-29.  Absent any foundation for his argument to the contrary, the Court cannot find that a reasonable employee would be deterred from pursuing an EEO Complaint because he knew he would be told not to ask certain questions of the Ethics Office.

### c.    Email

Finally, while actually subjecting Plaintiff to disciplinary action may have amounted to materially adverse action, merely advising him via email that if he continued a course of action he <u>might</u> be subject to discipline does not.  Our Circuit has held that a proposed disciplinary action does not constitute a materially adverse employment action.  <u>See</u> <u>Baloch v. Kempthorne</u>, 550 F.3d 1191, 1199 (D.C. Cir. 2008) ("[C]ourts have been unwilling to find adverse actions where the suspension is not actually served.") (citing <u>Whittaker v. N. Ill. Univ.</u>, 424 F.3d 640, 647 (7th Cir. 2005), and <u>Gupta v Fla. Bd. of Regents</u>, 212 F.3d 571, 588 n.15 (11th Cir. 2000) ("A threatened letter never actually written cannot constitute an adverse employment action.")).  The proposed disciplinary action at issue in <u>Baloch</u>, moreover, was far more concrete — a threatened suspension — than the vague suggestion that further action by Plaintiff would "result in the <u>consideration</u> of appropriate disciplinary action."  Compl., ¶ 47.  This was not a formal reprimand; it was merely an email.  <u>Cf.</u> <u>Herbert v. Architect of the Capitol</u>, --- F. Supp. 2d ---, 2011 WL 637549, at *12 (D.D.C. 2011) (holding that letter of reprimand placed in employee's official personnel folder for a year did not constitute adverse action that would dissuade a reasonable employee from pursuing EEO activity).  An employer's instruction that an employee follow a particular course of action or face the consideration of discipline thus would not dissuade a reasonable employee from pursuing an EEO complaint.  <u>See, e.g.</u>, <u>Brown v. Mills</u>, 674 F. Supp. 2d 182, 192-93 (D.D.C. 2009) (verbal reprimand instructing plaintiff to follow procedures not materially adverse).

As none of Plaintiff's named events, either singly or in concert, rises to the level of a materially adverse action, Count I may not proceed.  Indeed, even if the two unexhausted incidents could have been considered on their merits, they would fall into the same deficient category.

B.  Hostile-Work-Environment Claim (Count II)

Having addressed Plaintiff's discrete retaliation claims, the Court now turns to the issue

of hostile work environment, which Plaintiff claims he was subjected to in retaliation for his

EEO participation.  "To prevail on such a claim," Plaintiff must establish that he was "subjected

... to 'discriminatory intimidation, ridicule, and insult" that a reasonable jury could find was

"'sufficiently severe or pervasive to alter the conditions of his employment and create an abusive

working environment.'"  Baloch, 550 F.3d at 1201 (quoting Harris v. Forklift Sys., Inc., 510 U.S.

17, 21 (1993)). "To determine whether a hostile work environment existed, the court looks to the

totality of the circumstances, including the frequency of the discriminatory conduct, its severity,

its offensiveness, and whether it interferes with an employee's work performance." Id. at 1201

(citing Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998)). "The Supreme Court has

made it clear that 'conduct must be extreme to amount to a change in the terms and conditions of

employment.'" George v. Leavitt, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting Faragher, 524

U.S. at 788).  By adhering to these standards, the Court thereby "ensure[s] that Title VII does not

become a general civility code" that involves courts in policing "the ordinary tribulations of the

workplace."  Faragher, 524 U.S. at 788 (citation and quotation marks omitted).

The facts Plaintiff has pled cannot, as a matter of law, support a hostile-work-

environment claim.  The Court need not decide whether, as Defendants challenge, Plaintiff is

even permitted to make out a hostile-work-environment claim that relies on the same facts on

which his discrete retaliation claims are based.  Even assuming the veracity of all of Plaintiff's

allegations and giving him the benefit of all possible inferences, HUD did not subject Plaintiff to

conduct "sufficiently severe or pervasive to alter the conditions of his employment and create an

abusive working environment."  Harris, 510 U.S. at 21 (quoting Meritor Savings Bank, FSB v.

Vinson, 447 U.S. 57, 67 (1986)) (internal quotation marks omitted).  While Plaintiff may have

found some of the alleged incidents uncomfortable, none expressly focused on his protected

actions, and, considered as a whole, they do not come near what is required to support a hostile-

work-environment claim.  See, e.g., Hernandez v. Gutierrez, 656 F. Supp. 2d 101, 106 n.6

(D.D.C. 2009) (no hostile work environment where "one co-worker frequently touched his

private parts in front of [the plaintiff], told her his marriage was not the same as it used to be,

talked to her about humans and animals having sex, showed her sexually explicit pictures, and

told her that a paperclip could be used as a weapon and then . . . put a fist close to her face."

(internal quotation marks and citations omitted)); Taylor v. Chao, 516 F. Supp. 2d 128, 136–47

(D.D.C. 2007) (no hostile work environment where coworkers "asked if [Plaintiff's] hair were

'red all over,'" called her 'sweetie' and 'baby,' and offered to "beat up her fiancé"); Bryant v.

Brownlee, 265 F. Supp. 2d 52, 64 (D.D.C. 2003) (no hostile work environment where co-worker

referred to plaintiff as "nigger" and another co-worker said "black women were at the bottom.

The white men were first, the white women were right up there with them . . . .").

A hostile-work-environment claim is simply not a cause of action for the "ordinary

tribulations of the workplace." Franklin v. Potter, 600 F. Supp. 2d 38, 76–78 (D.D.C. 2009)

(quoting Faragher, 524 U.S. at 788) (internal quotation marks omitted).  Because Plaintiff has not

pled facts that a reasonable jury could find created a hostile work environment, the Court will

dismiss Count II for failure to state a claim.

C.  APA Claims (Counts III-V)

Plaintiff's next causes of action are more unusual.  He contends that HUD and Anderson

violated the APA when they failed to assign cases to ALJs via a rotation system and took other

actions that interfered with his judicial independence.  See Compl., ¶¶ 106-10.  OPM is similarly

charged with failing to protect that independence.  Id., ¶¶ 111-12.  Defendants, in response, argue that the Court lacks jurisdiction over these claims because they are precluded by the Civil Service Reform Act (CSRA).  See Mot. at 23-29.  In the alternative, Defendants argue that Plaintiff lacks standing.  Unfortunately for him, Plaintiff is caught between a rock and a hard place: to the extent his claims do not concern personnel actions and, accordingly, are not preempted by the CSRA, he lacks standing to bring them.

      1.   *CSRA Preemption*

The CSRA "regulates virtually every aspect of federal employment and 'prescribes in great detail the protections and remedies' applicable to adverse personnel actions, 'including the availability of administrative and judicial review.'"  Nyunt v. Chairman, Broad. Bd. of Governors, 589 F.3d 445, 448 (D.C. Cir. 2009) (quoting United States v. Fausto, 484 U.S. 439, 443 (1988)).  In general terms, for serious agency actions ("adverse actions"), the CSRA provides the right to file an action with the Merit Systems Protection Board (MSPB) and to appeal the MSPB's decision to the Court of Appeals for the Federal Circuit.  See 5 U.S.C. § 7703(b)(1).  For certain less serious actions ("prohibited personnel practices"), the CSRA requires an employee to seek redress from the Office of Special Counsel (OSC) before filing a claim with the MSPB.  See 5 U.S.C. § 2302(b).

As Defendants point out, the CSRA constitutes the exclusive "remedial regime for federal employment and personnel complaints," and "a long line of cases requires that federal employees pursue employment and personnel challenges . . . through the procedures set up by the [CSRA], rather than under the APA."  Nyunt, 589 F.3d at 448; see also Grosdidier v. Chairman, Broad. Bd. of Governors, 560 F.3d 495, 497 (D.C. Cir. 2009) ("Federal employees may not circumvent the [CSRA's] requirements and limitations by resorting to the catchall APA

to challenge agency employment actions."). While the CSRA expressly "maintains federal employees' rights to bring suit under Title VII and [certain] other anti-discrimination laws," Nyunt, 589 F.3d at 448 (citing 5 U.S.C. § 2302(d)), our Circuit has consistently held that the statute preempts personnel challenges brought under the APA. See, e.g., id.

Notably, the CSRA precludes resort to the APA even when its remedial scheme "ultimately would provide no relief: As [our Court of Appeals has] repeatedly said, 'what you get under the CSRA is what you get.'" Id. at 449 (quoting Filebark v. U.S. Dep't of Transp., 555 F.3d 1009, 1010 (D.C. Cir. 2009)). This makes sense. The CSRA was "designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration," Fausto, 484 U.S. at 445 (1988), and our Circuit has emphasized that Congress's "failure to include some types of nonmajor personnel action within the remedial scheme of so comprehensive a piece of legislation reflects a congressional intent that no judicial relief be available — that the matter be deemed 'committed to agency discretion by law.'" Carducci v. Regan, 714 F.2d 171, 174 (D.C. Cir. 1983) (quoting 5 U.S.C. § 701(a)(2)1976)). In other words, Plaintiff cannot avoid the preclusive effect of the CSRA by arguing that the CSRA would provide him no remedy. See id.; see also Roberts v. DOJ, 366 F. Supp. 2d 13, 21 (D.D.C. 2005) (finding CSRA barred APA claims despite fact that FBI employees have no remedy under CSRA).

In Gray v. Office of Personnel Mgmt., 771 F.2d 1504 (D.C. Cir. 1985), four ALJs brought APA claims challenging OPM's decision to promote thirty-nine other ALJs. Id. The ALJs argued that the Circuit precedent establishing that plaintiffs may not circumvent the CSRA even where the CSRA does not provide a remedy "[did] not apply at all to suits brought by ALJs pursuant to the [APA]; in their view, the institutional need of ALJs for decisional independence

mandate[d] a greater degree of protection than that afforded by the CSRA." Id. at 1509.  Citing

"numerous statutory provisions in which ALJs are singled out for special treatment," the ALJs

contended "that unless judicial review [was] available a 'wrong thinking' ALJ could be punished

and left with no effective means to counteract the coercive effect of personnel policies

implemented for this illicit purpose." Id. at 1510.  The D.C. Circuit rejected that argument,

finding no "special status" for ALJs and holding that the remedies available to ALJs for

allegedly prohibited personnel practices, even those purported to constitute an infringement of

"decisional independence," are proscribed by the CSRA. See id. at 1510.  ALJs, accordingly, are

treated no differently than other federal employees in considering whether their claims are

preempted by the CSRA.

Plaintiff nevertheless maintains that the CSRA does not preempt his APA claims because

his allegations do not concern "personnel actions" and are therefore outside the scope of the

CSRA. See Opp. at 33-38.  Defendants' primary response is to insist that the preclusive effect of

the CSRA "does not turn on the viability of Plaintiff's potential CSRA claims." Reply at 21.

Defendants are correct, see, e.g., Nyunt, 589 F.3d at 449, but miss the point.  The fact that the

CSRA bars APA claims even when the personnel action complained of is not actionable under

the CSRA does not entirely respond to Plaintiff's argument that his claims do not involve

personnel actions at all.  In other words, while it is true that the CSRA effectively preempts all

claims based on federal-employee personnel actions, it does not necessarily follow that CSRA

preempts claims by federal employees that do not concern personnel actions.  Indeed, the

Supreme Court has noted that the CSRA does not bar all non-discrimination claims a federal

employee might bring against his employer: "[C]ertain actions by supervisors against federal

employees, such as wiretapping, warrantless searches, or uncompensated takings, would not be

defined as 'personnel actions' within the statutory scheme." Bush v. Lucas, 462 U.S. 367, 385 n.28 (1983).  In Stewart v. Evans, 275 F.3d 1126 (D.C. Cir. 2002), our Circuit interpreted Bush and held that the "[CSRA] does not preclude a Bivens actions for a warrantless search" because a warrantless search of an employee's papers was not a "personnel action" covered by the CSRA. Id. at 1130.

The question, then, is whether the actions Plaintiff seeks to challenge are "personnel actions" and therefore within the scope of — even if not compensable under — the CSRA. Plaintiff's APA claims concern several actions: the manner in which cases are assigned to ALJs, Anderson's *ex parte* communications with parties, HUD's practice of providing DOJ with advanced notice of Notices of Election in Fair Housing Act cases, Anderson's failure to provide Plaintiff with docket numbers for Mortgagee Review board cases, HUD's failure to supply ALJs with legal-research resources, and OPM's failure to intervene.  See Compl., ¶¶ 61-101.  Though Bush and Stewart made clear that some actions taken by supervisors are outside the purview of the CSRA — in particular, warrantless searches and, presumably, wiretapping and uncompensated takings (the other actions enumerated in the Bush footnote) — they provide little guidance about how CSRA-covered personnel actions should be distinguished from those actions that are beyond the CSRA's coverage.

It seems, nevertheless, that Plaintiff's allegations, considered in the light most favorable to him, are different in kind from the actions that have been considered personnel practices and therefore preempted by the CSRA.  See, e.g., Carducci, 714 F.2d at 171 (reassignment); Filebark, 555 F.3d at 1010 (salary dispute); Fornaro v. James, 416 F.3d 63, 65 (D.C. Cir. 2005) (annuity benefits); Graham v. Ashcroft, 358 F.3d 931, 932-33 (D.C. Cir. 2004) (letter of censure).  Unlike the claims raised in Carducci and its progeny, Plaintiff's claims do not concern his employment

status, compensation, job responsibilities, or even his working conditions.  They do not implicate

the "personnel management" issues that motivated the CSRA.  See CSRA, Pub. L. No. 95-454,

Sec. 3 ("Findings and Statement of Purpose").  At bottom, Plaintiff's concern in Counts III-V

(unlike Counts I and II) is not with the relationship between himself and his employer; rather,

Plaintiff's contentions strike at the neutrality of HUD's adjudicative process as a general matter.

The Court, accordingly, finds that the CSRA does not preclude its jurisdiction over Plaintiff's

APA claims to the extent they do not concern personnel actions.

### 2.  *Standing*

In order to successfully navigate past CSRA preemption, however, Plaintiff makes

arguments that demonstrate that he has no standing on these APA counts.  In other words, to the

extent his claims do not concern personnel actions, he lacks standing to bring them.   To

establish Article III standing, Plaintiff "must show (1) an injury in fact that is 'concrete and

particularized' and 'actual or imminent'; (2) that the injury is fairly traceable to the defendant's

challenged conduct; and (3) that the injury is likely to be redressed by a favorable decision."

American Soc. For Prevention of Cruelty to Animals v. Feld Entertainment, Inc., --- F.3d ---,

2011 WL 5108581, at *3 (D.C. Cir. Oct. 28, 2011) (quoting Lujan v. Defenders of Wildlife, 504

U.S. 555, 560-61 (1992)).  Judge Mahoney contends that he suffered an "injury to his qualified

right of judicial independence" under the APA; in the alternative, he argues he suffered a

reputational injury sufficient to establish standing.  See Opp. at 46, 48 n.21.  As Plaintiff cannot

demonstrate an injury in fact on either ground, the Court must dismiss his APA claims.

Plaintiff's primary argument is that he holds a right to judicial independence that

Defendants' actions infringed, thereby causing him injury.  In Goodman v. Svahn, 614 F. Supp.

726 (D.D.C. 1985), Judge Thomas F. Hogan of this court held that an ALJ did not suffer an

injury in fact and, accordingly, lacked standing to claim that the Social Security Administration's

practice of "imposing arbitrary case production quotas on [ALJs] . . . violated his rights to

decisional independence under the Administrative Procedure Act."  Id. at 728.  The court

reasoned:

> An administrative law judge's individual rights associated with his
> position are purely the creation of Congressional enactment, and
> are not Constitutionally protected.  Ramspeck v. Trial Examiners
> Conference, 345 U.S. 128, 133 . . . (1953); see also Nash v.
> Califano, 613 F.2d 10, 15 (2d Cir. 1980).  An administrative law
> judge's rights, therefore, are limited to the protections of his
> compensation and tenure found in the Administrative Procedure
> Act.  Consequently, to the extent a larger right of decisional
> independence exists, . . . such a right would belong to the claimants
> whose rights are adjudicated by the ALJs, rather than to the ALJs
> themselves, and therefore would not create a right to relief in this
> plaintiff.

Id.

Earlier this year, in Fernandez v. Donovan, 760 F. Supp. 2d 31 (D.D.C. 2011), Judge

Leon followed Goodman, finding that ALJ Fernandez (the same individual whose discrimination

complaint kick-started the alleged retaliation at issue in this case) lacked standing to bring

substantially similar APA claims.  The court found that ALJ Fernandez's "allegations [did] not

implicate an issue broad enough to affect plaintiff's actual decision making.  See Nash, 613 F.2d

at 16.  The injury . . . , therefore, [did] not lie with the ALJ, but — as this Court made clear in

Goodman — with the parties appearing before the ALJ.  Goodman, 614 F. Supp. at 728."

Fernandez, 760 F. Supp. at 37 n.5.  Plaintiff does not attempt to distinguish Fernandez, arguing

merely that this Court "should reject Judge Leon's analysis" because it "fail[ed] to consider the

significance of the claims raised by Judge Fernandez and Judge Mahoney," Opp. at 53, and,

instead, follow the Second Circuit's decision in Nash v. Califano, 613 F.2d 10 (2d Cir. 1980).

Opp. at 45.

In Nash, the Second Circuit held that the APA "confer[s] a qualified right of decisional independence upon ALJs." 613 F.2d at 15. The court found that because the APA's grant of independence "is expressed in terms of such personal rights as compensation, tenure and freedom from performance evaluations and extraordinary review, [it could not] say that ALJs are so disinterested as to lack even standing to safeguard their own independence." Id. at 16.

Though the Court is not bound by Nash, it, like Judge Leon in Fernandez, finds the Second Circuit's decision to be distinguishable. Nash turned on the fact that the plaintiff in that case alleged he was subjected to "scrutiny and affirmative direction" that "reache[d] virtually every aspect of an ALJ's daily role. . . . [T]he number of reversals, the number of dispositions, and the manner of trying and deciding each case [were] recorded and measured against prescribed standards. [The ALJs] allegedly receive[d] mandatory, unlawful instructions regarding every detail of their judicial role." Id. Whereas the claims at issue in Nash involved interference with nearly every aspect of the ALJs decisionmaking process (hence, perhaps, the Second Circuit's reference to "decisional independence"), Judge Mahoney does not claim that Anderson's or HUD's actions influenced or sought to influence his decisionmaking in the cases before him. See Fernandez, 760 F. Supp. at 37 n.5 ("allegations [did] not implicate an issue broad enough to affect plaintiff's actual decision making"). In other words, his judicial independence was not compromised by, for example, a requirement that he rule a particular way in certain cases.

Selectively assigning cases "based upon political considerations" instead of by rotation, Compl., ¶ 61, making ex parte contacts with parties of which Plaintiff was not even aware, id., ¶¶ 62-65, providing DOJ with advanced notice of Notices of Election, id., ¶¶ 66-73, and the other

incidents of which Plaintiff complains might well result in unfair results for litigants.  But it is the litigants, not the judges, who are injured.

Plaintiff protests that because "the parties appearing before the ALJ," many of whom are *pro se*, "are <u>not</u> aware of the violations of the law or the threats to judicial independence resulting from [D]efendant Anderson's actions,"  <u>no one</u> will "be able to effectively challenge [his] actions" under the <u>Goodman</u> rule.  <u>See</u> Opp. at 49.  <u>Goodman</u>, however, explicitly left open the possibility that an ALJ might have standing to bring this kind of claim on behalf of the litigants that appear before him.  <u>See</u> 614 F. Supp. at 728 n.2 (noting that had the plaintiff asserted his claims "on behalf of the Social Security claimants who appear before him," those claims "would certainly present a serious question of standing involving considerations of whether the claimants could adequately assert such claims on their own behalf and whether the plaintiff could in fact fairly represent [their] interests").  But, like the plaintiff in <u>Goodman</u>, Judge Mahoney seeks to bring these APA claims on the grounds that <u>his own rights</u> were violated, not as a representative of litigants whose rights were violated.  Despite the fact that he states in his Opposition that the interests he "seeks to advance . . . are identical to the interests of the parties who appear before ALJ," Opp. at 51, Plaintiff never purports to bring suit on behalf of anyone else.

The Court is not unsympathetic to Judge Mahoney's concerns; if his allegations are true, the Court is inclined to agree that all is not well at HUD's OHA.  Ultimately, however, the Court will follow <u>Goodman</u> and <u>Fernandez</u> in finding that the parties appearing before the ALJs, not the ALJs themselves, are the individuals with standing to bring these claims, particularly since Plaintiff has not alleged an infringement of his independent decisionmaking authority.

Finally, in a footnote in his Opposition, Plaintiff suggests that if the Court finds he lacks standing on the basis of his alleged right to judicial independence, it nevertheless should find he suffered an injury to his reputation sufficient to establish standing.  See Opp. at 48 & n.21. Pointing out that "injury to reputation can constitute a cognizable injury sufficient for Article III standing," Foretich v. United States, 351 F.3d 1198, 1211 (citing Meese v. Keene, 481 U.S. 465, 473-77 (1987)), he suggests that the Court should find standing based on reputational damage resulting from "Anderson's actions and the attendant publicity."  Opp. at 48 n.21.  This argument does not hold up.  First, Plaintiff's Complaint makes no mention of any publicity in his Complaint.  Second, as Defendant suggests, "an allegation that an employer has violated a law says nothing about the character or reputation of any particular employee."  Reply at 29.  And third, Plaintiff has not alleged any concrete, particularized injury to his reputation.  Cf. Meese v. Keene, 481 U.S. 465, 473-74 (1987) (finding standing on basis of reputational damage where plaintiff's "chances for reelection" suffered "substantial[] harm"); Foretich, 351 F.3d at 1213 (finding a "concrete" injury to plaintiff's reputation where the government's action "effectively brand[ed] him a child abuser and an unfit parent").

## IV.  Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss except as to the two unexhausted claims, on which it will grant Defendants' Alternative Motion for Summary Judgment.  A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  November 14, 2011